Argued and submitted February 29, resubmitted In Banc June 12, affirmed
July 24, petition for review denied October 22, 1996 (324 Or 323)

Dawn C. ULRICH,
*Petitioner,*

*v.*

SENIOR AND DISABLED SERVICES DIVISION,
*Respondent.*

(4-0312-AZ0603; CA A86249)

921 P2d 982

Megan E. Glor argued the cause for petitioner. With her on the brief was Swanson, Thomas & Coon.

Erika L. Hadlock argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

HASELTON, J.

Edmonds, J., dissenting.

**HASELTON, J.**

Petitioner seeks review of the Senior and Disabled Services Division's (SDSD) denial of her claim for benefits under the Spousal Pay Program. ORS 411.803; OAR 411-30-080. We affirm.

Eligibility for Spousal Pay benefits is circumscribed by one statute and two regulations. ORS 411.803 provides:

> "When a married recipient of public assistance provided under ORS chapter 412 or 413 requires in-home care, the Adult and Family Services Division or the Senior and Disabled Services Division, as appropriate, shall provide that such care be compensated even though provided by the spouse, *in the manner and to the extent specified by rule of the appropriate division based on the extent of need and the availability of funds therefor.*" (Emphasis supplied.)

OAR 411-30-080(1) provides, in part:

> "(a)   In-home care provided by the spouse of an OSIP/ Title XIX client is compensable by the Division under ORS 411.803 only when the following conditions are met:
>
> "(A)   The client requires *full assistance* in at least four of the six activities of daily living, as determined by the assessment, *and would require nursing facility placement without in-home services*[.]" (Emphasis supplied.)

OAR 411-30-020 provides, in part:

> "As used in these rules:
>
> "(1)   'Activities of Daily Living' (ADL) means those personal functional activities required by an individual for continued well-being, health, and safety. This includes eating, dressing/grooming, bathing/personal hygiene, mobility, bowel and bladder management, and cognition.
>
> "* * * * *
>
> "(14)   *'Full Assistance' means the client is unable to do any part of the activity of daily living or task; i.e., it must be done entirely by someone else.*"[1] (Emphasis supplied.)

---

[1] OAR 411-30-020 also includes definitions for "minimal assistance" and "substantial assistance":

"(23) 'Minimal Assistance' means the client is able to perform a majority of a task, but requires some assistance.

The material facts, as found in SDSD's second amended final order, are not in dispute: Petitioner lives with her husband and three children. She suffers from various mental illnesses or disorders, including panic disorder with agoraphobia,[2] post-traumatic stress disorder, anxiety disorders, multiple personality disorder, and Xanax dependence.[3]

As a result of her various mental impairments, petitioner is unable to leave her home and requires personal and housekeeping services, which her husband provides. Moreover, petitioner becomes panic stricken and is unable to function if her husband is not visibly present.

In particular, without her husband's visible presence, petitioner experiences panic and is unable to eat, dress or groom herself, bathe or undertake basic personal hygiene, move even within her own home, exercise bladder or bowel control, or think rationally, including orienting herself to time and place and protecting herself from common dangers.[4]

---

"* * * * *

"(34) 'Substantial Assistance' means a client can perform only a small portion of a task and requires assistance with a majority of a task."

[2] The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (Third Edition-Revised 1987) at 236 describes agoraphobia:

"Agoraphobia is the fear of being in places or situations from which escape might be difficult (or embarrassing) or in which help might not be available in the event of a panic attack. As a result of this fear, there are either travel restrictions or need for a companion when away from home, or there is endurance of agoraphobic situations despite intense anxiety."

[3] Xanax is a brand name for benzodiazepine, which is prescribed for the management of anxiety disorders. Petitioner was first given Xanax in the mid-1980's to help relieve anxiety associated with other disorders. However, after she reached a certain tolerance level, her use of the drug exacerbated, rather than mitigated, her anxiety-related symptoms. Petitioner's physician, Dr. Schenkel, described the effects of Xanax withdrawal:

"Severe benzodiazepine dependence and withdrawal can make heroin induced problems seem small: acute withdrawal following complete abstinence can last for several years. Withdrawal is characterized by chronic panic and anxiety, sensory overstimulation, and a need for constant reassurance."

[4] Dr. Schenkel described an illustrative instance of petitioner's panic disorder, post-traumatic stress disorder, and Xanax dependence:

"In early August, 1994, while [petitioner] was asleep, [her husband] left the house to pick peaches and was gone for about fifty minutes. [Petitioner] awoke soon after he left and was quickly panic-stricken: she became confused, disoriented, and incontinent of urine and feces, and she was unable to breathe normally, walk, or talk. She was essentially paralyzed both physically and cognitively."

Conversely, when her husband is visibly present, petitioner's panic lessens[5] and she is generally able to perform each of those functions.

In January 1994, petitioner applied for Spousal Pay benefits, by which her husband would be compensated for his provision of personal care and housekeeping services. In its second amended final order, SDSD denied that application, concluding that petitioner did not require "full assistance" in performing at least four of the six activities of daily living:

> "Although [petitioner] needs [her husband's] visible presence and often needs prompting or encouragement from him to perform the activities of daily living, [petitioner] physically is able to do all or part of each of the activities of daily living, except cognition. Therefore, in the activities in which [petitioner] needs assistance, she needs only minimal or substantial assistance. In no area except cognition does she require full assistance."

On review, petitioner challenges SDSD's order on two grounds: (1) The agency's findings do not support its determination that she does not require "full assistance" in at least four of the six activities of daily living. (2) SDSD's interpretation and application of OAR 411-30-020 and OAR 411-30-080(1) to deny benefits violates the Americans With Disabilities Act, 42 USC § 12132, by impermissibly discriminating against claimants with mental, rather than physical, impairments. The second assignment was not raised and preserved below and does not present error apparent on the face of the record. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 823 P2d 956 (1991). Accordingly, we limit our discussion to petitioner's first assignment of error.

Petitioner argues that SDSD's "full assistance" conclusion is wrong because the uncontroverted facts demonstrate that, unless her husband is present, she "is unable to

---

[5] Dr. Schenkel noted that, even when petitioner's husband is present, her anxiety does not completely dissipate:

> "[Petitioner] suffers from varying degrees of panic when [her husband] is present and severe episodes can last anywhere from hours to weeks. During these times [petitioner] requires [her husband's] verbal reassurance, supervision and physical assistance to meet her basic needs. At her best [petitioner] struggles with substantial anxiety and is at no time fully functional."

do any part of" any activity of daily living. OAR 411-30-020(14). She reasons that SDSD's denial of benefits was ultimately premised on its assessment of her capacity when her husband was present and that that analysis improperly "shifted the focus from Mrs. Ulrich's level of function * * * to Mr. and Mrs. Ulrich's ability to perform the [Activities of Daily Living] as a 'team.' "

SDSD responds that petitioner's reading of the definition of "full assistance" in OAR 411-30-020(14) is impermissibly selective. In particular, the agency asserts that petitioner ignores the definition's express qualification, *i.e.*, "the activity of daily living or task * * * must be done entirely by someone else." SDSD contends that the record demonstrates that, although her husband's presence may facilitate petitioner's performance of various activities, her husband does not perform any, much less all, of an activity or task himself. In that sense, SDSD contends, petitioner's situation is directly analogous to that of a person who is unable to climb into a bathtub but, once so assisted, can bathe herself:

> "Under the OAR 411-30-020(14) definition, that person would not require 'full assistance' with bathing because the task is not 'done entirely by someone else.' Notwithstanding the fact that the person could not take a bath at all without preliminary assistance, he could not use that as a basis for obtaining spousal pay benefits. Similarly, petitioner's husband testified that petitioner 'would never get into the bathroom to bathe' if he were not there. However, once he has motivated petitioner to bathe, he does not have to wash her, as she is able to bathe herself. * * * Nothing in the SDSD regulations suggests that petitioner's situation should be treated differently from that of a physically disabled person who also requires the enabling presence of an assistant to bathe or perform other ADLs."

There is merit in each party's position. Petitioner is caught in a classic "catch-22": She is generally incapable of performing daily living activities and tasks—an inability that would ordinarily qualify her for Spousal Pay benefits. However, because the single exception to her general incapacity is that she is able to perform such tasks in her husband's presence, and without his physical assistance, she is deemed ineligible for Spousal Pay benefits.

Given petitioner's singular circumstances—circumstances SDSD almost certainly did not contemplate in promulgating the Spousal Pay Program rules—the agency *could* have construed and applied those rules to provide benefits in this case. SDSD could, for example, have determined that, because petitioner is incapable of performing any part of any living task except when her husband is present, her condition, on balance, requires "full assistance," triggering an entitlement to benefits.[6] But SDSD did not opt to so construe its rules. The construction that SDSD did adopt and apply is "plausible" and is neither "inconsistent with the wording of the rule itself, [nor] with the rule's context, [nor] with any other source of law." *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). Accordingly, we are constrained to sustain SDSD's interpretation of its own rule. *Id.*

The dissent argues forcefully that SDSD's interpretation and application of its rules is not "plausible." In particular, the dissent asserts that "[t]he rule provides a means for the spouse to act as a substitute care provider and thereby to avoid the need for nursing home care," 142 Or App at 300, and that SDSD's decision in this instance cannot be reconciled with that purpose.

We agree with the dissent's assessment of the purposes of the Spousal Pay Program but not with its conclusion. ORS 411.803 permits SDSD to condition eligibility for spousal benefits as it sees fit, and SDSD has narrowly circumscribed that entitlement. Thus, under OAR 411-30-080(1)(a)(A), the fact that the client "would require nursing facility placement without in-home services" does not, by itself, trigger an entitlement to benefits. Instead, the claimant must *also* require "full assistance"—not "minimal" or "substantial" assistance—in at least four of the six ADLs. "Full assistance" means that the ADLs "must be done entirely by someone else."

---

[6] Such a construction would, no doubt, have been "plausible." *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). However, as amplified below, we disagree with the dissent that SDSD's construction was, consequently, implausible.

Viewed in its entirety, the Spousal Pay Program as defined and conditioned in OAR 411-30-080 is designed to compensate spouses who act as substitute care providers by providing "full assistance" services to their disabled husbands or wives. Thus, entitlement depends on a spouse actually performing the same tasks that a third-party care provider would—*i.e.*, actually performing at least four of the six activities of daily living for the client.

Here, Mr. Ulrich did not actually perform any of the activities of daily living. He clearly facilitated his wife's performance of those tasks, but facilitation is not performance. Thus, it was not implausible for SDSD to read its rules as not affording any entitlement to benefits.[7]

In sustaining SDSD's interpretation, we fully recognize that, in this case, that construction yields a poignant, arguably counterintuitive, result. As petitioner's able counsel observed:

"[Under SDSD's construction,] if Mr. Ulrich were to return to work, leaving Mrs. Ulrich in a nonfunctional state, she would qualify for the Spousal Pay Program and he could leave work!"

Nevertheless, the remedy, if any, lies elsewhere.

Affirmed.

**EDMONDS, J.,** dissenting.

This case is about Senior and Disabled Service Division's interpretation of its own rule in a manner that frustrates the very purpose of the benefits that the agency

---

[7] The actual rendition of full assistance distinguishes this case from the first hypothetical posed in the dissent. *See* 142 Or App at 301. In that hypothetical, the client is unable to perform the ADLs except in the presence of someone other than his or her spouse. Presumably, in that scenario, the spouse would be required to render full assistance in the third person's absence, by actually performing the ADLs for the client.

The dissent also poses a hypothetical involving assistance in eating, and posits that "the requirement of 'full assistance' must be flexible enough to encompass any facet of the function necessary to its completion." 142 Or App at 301-02. That approach, however commendable, cannot be reconciled with—and, indeed, obviates—the definition of "substantial assistance" in OAR 411-30-020(34). *See* 142 Or App at 292 n 1.

administers. The agency denied spousal pay benefits to petitioner even though her health condition requires that her husband stay at home and care for her. Apparently, the majority's and the agency's decision will force her removal from her home to a nursing home to receive the care that she requires, a result that is directly contrary to the purpose underlying spousal pay benefits. I dissent because I agree with petitioner's argument that the agency incorrectly interpreted OAR 411-30-020(14) when it ruled that petitioner does not qualify for spousal pay assistance.

To be entitled to benefits under the spousal pay program when a married recipient of public assistance requires in-home care, the recipient must require "full assistance in at least four of the six activities of daily living as determined by the assessment and would require nursing home facility placement without in-home services * * *." OAR 411-30-080(1)(a). OAR 411-30-020 provides, in part:

"(1) 'Activities of Daily living' (ADL) means those personal functional activities required by an individual for continued well-being, health and safety. This includes eating, dressing/grooming, bathing/personal hygiene, mobility, bowel and bladder management, and cognition.

"* * * * *

"(14) 'Full Assistance' means the client is unable to do any part of the activity of daily living or task; *i.e.*, it must be done entirely by someone else."

Based on the record before it, the agency concluded that petitioner requires full assistance in only one of six activities of daily living and, therefore, she does not qualify for benefits under the spousal pay program. That conclusion, however, is inconsistent with its own findings. The agency found:

"*Without Mr. Ulrich's visible presence*, Mrs. Ulrich experiences panic and becomes unable to cook, cut her food, chew or swallow. *When Mr. Ulrich is present, Mrs. Ulrich can eat.*

"*Without Mr. Ulrich's visible presence, Mrs. Ulrich* experiences panic and becomes unable to move, organize herself or make decisions. In that way, she *becomes unable to dress*

*or groom herself. In Mr. Ulrich's presence, Mrs. Ulrich can dress and groom herself.*

"*Without Mr. Ulrich's visible presence, Mrs. Ulrich* experiences panic and *becomes unable to perform the personal tasks of bathing or personal hygiene,* in that she cannot move to the bathroom or bedroom or use the sundries and instruments if she happens to be there. *In his presence, Mrs. Ulrich can perform personal hygiene tasks.*

"* * * *Without Mr. Ulrich's visible presence, Mrs. Ulrich experiences panic and becomes unable to travel between the rooms of her house. In his presence, she is capable of mobility.*

"*Without Mr. Ulrich's visible presence, Mrs. Ulrich* experiences panic and she often *loses bowel and bladder control* and is unable to move to the bathroom or use the toilet. *In his presence, she can manage her bladder and bowels and use the bathroom.*

"*Without Mr. Ulrich's visible presence, Mrs. Ulrich cannot think rationally, make decisions, coordinate muscle movement,* distinguish between perception and imagination, orient herself to place or time, or protect herself from every day dangers." (Emphasis supplied.)

According to the agency, these findings demonstrate that petitioner does not need "full assistance" within the meaning of the rule because she is able to perform the ADLs "in part" when her husband is visibly present. The issue on review is whether the agency's interpretation of its own rule as applied to the facts of this case is correct. Our standard of review is expressed in *Don't Waste Oregon Com. v. Energy Facility Siting,* 320 Or 132, 142, 881 P2d 119 (1994).

"As noted, this court is authorized to overrule an agency's interpretation of a rule if an agency has 'erroneously interpreted a provision of law.' ORS 183.482(8)(a). In this case, the 'provision of law' is the rule itself. Where, as here, the agency's plausible interpretation of its own rule cannot be shown either to be [1] inconsistent with the wording of the rule itself, or [2] with the rule's context, or [3] with any other source of law, there is no basis on which this court can assert that the rule has been interpreted 'erroneously.' "

"Plausibility" connotes only superficial worthiness. Thus, under the above standard, the possibility that the agency's

interpretation of the rule is plausible does not end the inquiry. Rather, the agency's interpretation to be upheld must be consistent with the rule's text and context or meaning as a whole.

In that light, OAR 411-30-020(14) is intended to provide care benefits to a disabled person in the person's home. The rule addresses the specific situation where the care provider is married to the recipient of the benefits. Read in context, the rule authorizes the payment of benefits despite the care provider's relationship to the recipient when the recipient requires "full assistance" in at least four of the six activities of daily living and otherwise, would require nursing home facility placement. The text of the rule requires the agency to focus on what the disabled person is able to do without assistance. Whether the care provider is the spouse or a third person is irrelevant to that focus. It is only after a determination is made about what functions the disabled person is able to perform, that payment of benefits for care provided by a spouse, rather than a third person, becomes germane. Thus, "assistance" as used in the context of the rule refers to help that could be given by anyone.

In this case, the agency initially focused on what petitioner could or could not do without anyone's assistance. According to its findings, petitioner is unable to perform the ADLs of thinking rationally, making decisions, orienting herself to time or place, eating, dressing herself, fulfilling personal hygiene tasks, moving within the area of her own house or managing her own bladder and bowels without assistance. Those are circumstances that require nursing home care and the assistance of a care provider and that implicate the need for the benefits contemplated by the rule. The rule provides a means for the spouse to act as a substitute care provider and thereby to avoid the need for nursing home care. There could be no clearer case of the need for full assistance in performing ADLs than that which petitioner presents.

Nonetheless, Agency asserts that the definition of "Full Assistance" in OAR 411-30-020(14) supports its interpretation because to qualify under the rule, a recipient must be unable to perform any part of an ADL, "*i.e.*, it must be done entirely by someone else." It follows, according to agency,

that because petitioner is able to perform ADLs in her husband's presence, she is able to perform them in part (an ability that disqualifies her under the rule). It is at that point in the analysis that the agency's interpretation gets off track, and its interpretation of the rule becomes inconsistent with the context of the rule as a whole. In sum, the agency's interpretation improperly changes the focus from what the client is able to do without assistance to what she is able to do when her husband is present.

The following hypothetical illustrates the point. Suppose, for example, that petitioner's condition was such that she would be unable to perform the ADLs except in the visible presence of a third person, other than her husband. In the context of the rule, she would still require full assistance to perform the ADLs. Her condition would require either nursing home care or full home care provided by a third person. Thus, the fact that petitioner can perform ADLs in the presence of her husband rather than in the presence of someone else is of no significance in the determination of whether she meets the criteria of "full assistance."

Similarly, the fact that petitioner can perform ADLs in the presence of her husband does not disqualify her when the context of the rule is considered. According to the rule's text, a recipient must be unable to do *any part* of the ADL to qualify, *i.e.*, the ADL must be performed entirely by someone else. In context, the disqualifying part-performance of an ADL must refer to the ability to perform those facets of the ADL that are not integral to the completion of the task. Otherwise, the purpose of the benefits is defeated. Example: if a recipient needed someone else to manually lift the eating utensil to her mouth to eat, that circumstance would satisfy the rule's requirement. Without the assistance of the care provider, the recipient could not eat or perform the entire function. The fact that the recipient could chew or digest the food placed in her mouth would not disqualify her from benefits. On the other hand, if the disabled person could personally feed herself, that ability could disqualify her from benefits. In that light, the only reasonable interpretation of the rule is that the requirement of "full assistance" must be flexible enough to encompass any facet of the function necessary to its completion, and the inability to perform any facet that

results in the complete impairment of the ADL qualifies the recipient as needing "full assistance."

In this case, the presence of petitioner's husband is even more indispensable to her ability to eat than the assistance of the care provider in the example. According to the findings, petitioner cannot chew or swallow without her husband's presence. Presumably, she will have to be fed intravenously if placed in a nursing home in the absence of her husband's presence. The fact that petitioner's husband provides indispensable psychological assistance rather than physical assistance to enable her to eat is of no import under the requirements of the rule. In either case, the disabled person is unable to eat *without full assistance*. A similar rationale applies to the inability of petitioner to perform the other ADLs.

When an agency interprets its own rule inconsistently with the wording of the rule itself or the rule's context, we are not obligated to adopt that interpretation. *Don't Waste Oregon Com.*, 320 Or at 142. In this case, agency misinterpreted its own rule when it focused on what petitioner's husband could do for petitioner rather than on what petitioner could do for herself in the absence of her husband or anyone else and when it adopted an interpretation that is inconsistent with the purpose of the rule. For those reasons, the majority errs when it affirms agency's "plausible" ruling that petitioner is not entitled to spousal pay benefits under OAR 411-30-080(1)(a), and a grave injustice to petitioner and her husband results.

Accordingly, I dissent.

Warren and Armstrong, JJ., join in this dissent.