**SAN ANTONIO COMMUNITY HOSPITAL, Plaintiff– Appellee,**

v.

**SOUTHERN CALIFORNIA DISTRICT COUNCIL OF CARPENTERS, an unincorporated association; Carpenters Local 1506, an unincorporated association; Does 1 Through 100, Defendants–Appellants.**

No. 96–56124.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 3, 1997.

Decided June 4, 1997.

Gerald V. Selvo and Daniel M. Shanley, DeCarlo, Connor & Selvo, Los Angeles, California, for the defendants-appellants.

Douglas R. Hart and Teresa F. Elconin, Sheppard, Mullin, Richter & Hampton, Los Angeles, California, for the plaintiff-appellee.

Before: FARRIS, KOZINSKI, and T. G. NELSON, Circuit Judges.

## OPINION

T. G. NELSON, Circuit Judge:

Southern California District Council of Carpenters ("the Union") appeals the district court's issuance of a preliminary injunction restricting the manner in which the Union had displayed a banner purporting to publicize its labor dispute with Best Interiors, a subcontractor engaged in a construction project at San Antonio Community Hospital ("the Hospital"). The district court concluded that the Hospital had met the strict requirements for a preliminary injunction set forth in the Norris–LaGuardia Act ("NLA"), 29 U.S.C. §§ 101–115. We have jurisdiction under 28 U.S.C. § 1292(a). We affirm.

## I. FACTS

The Union is currently engaged in an ongoing labor dispute with Best Interiors, a construction company, over Best Interiors' failure to pay its employees prevailing wages and benefits. Best Interiors is a subcontractor in an expansion project at the Hospital. There is no contract between Best Interiors and the Hospital. The Union concedes that it does not now have, and has never had, a labor dispute with the Hospital.

On June 21, 1996, the Union began displaying a banner near the Hospital's construction site and the entrance to the Hospital's maternity ward that was visible by passersby driving on San Bernardino Road in front of the Hospital and patients entering the maternity ward. The banner is displayed during the morning hours and is held by three retired members of the Union. In twelve-inch red capital letters on two lines, the banner reads: "THIS MEDICAL FACILITY IS FULL OF RATS." Below those lines, in five-inch red capital letters on two lines that appear just above the feet of the banner's holders, it reads: "CARPENTERS L.U. 1506 HAS A DISPUTE WITH [_____] FOR FAILING TO PAY PREVAILING WAGES TO ITS WORKERS." In the blank space, in two-inch black handwritten letters, the banner reads: "Best Int." [1]

On June 25, 1996, the Hospital filed unfair labor practice charges against the Union with the National Labor Relations Board ("NLRB"). During the NLRB investigation, there were several attempts to reach a negotiated agreement between the Union and the Hospital. After completing its investigation, the NLRB Regional Office determined that evidence could not support the Hospital's allegations, and the Hospital withdrew its charges.

On July 11, 1996, the Hospital filed this lawsuit in the district court, including various state tort claims and a federal claim for an unlawful secondary boycott under 29 U.S.C. § 187. On July 17, 1996, the Hospital filed a motion for a temporary restraining order which the district court denied on July 22, 1996, because the Hospital had failed to satisfy the requirements of the NLA.

On August 9, 1996, the district court held an evidentiary hearing on the Hospital's request for a preliminary injunction. After hearing the testimony of witnesses from both sides, the district court ruled that the Hospital had met the requirements for a preliminary injunction set forth in the NLA. The district court ordered that the Union's members "are hereby preliminarily enjoined from using the term, 'Rats,' as they currently have in their banner which they display in front of

---

1. At about the time the Union began displaying the banner, the banner's holders also began distributing a handbill to interested pedestrians which explained that "[a] rat is a contractor that does not pay all of its employees prevailing wages or provide health and pension benefits to all of its employees."

plaintiff San Antonio Community Hospital." This timely appeal followed.

## II. DISCUSSION

■ A district court's order regarding preliminary injunctive relief is subject to limited review. The grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Does 1–5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir.1996). Although district courts have wide discretion in issuing preliminary injunctions, "where the district court is alleged to have relied on erroneous legal premises, review is plenary." *Id.* (internal quotation omitted). Thus, we review issues of law underlying the decision on a preliminary injunction *de novo. Id.*

### A. *The Norris–LaGuardia Act*

The NLA is an anti-injunction statute that prevents district courts from issuing "any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this Act." 29 U.S.C. § 101. The NLA denies jurisdiction to district courts to issue preliminary injunctions that would prevent union members from "[g]iving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method *not involving fraud or violence*." 29 U.S.C. § 104(e) (emphasis added).

■ In addition to providing evidence of fraud or violence, the Hospital, as proponent of the preliminary injunction, was required to prove the following additional elements:

1) That unlawful acts have been threatened and will be committed unless restrained (29 U.S.C. § 107(a));

2) That substantial and irreparable injury to the Hospital's property will follow (29 U.S.C. § 107(b));

3) That greater injury will be inflicted upon the Hospital by the denial of relief than will be inflicted upon the Union by the granting of relief (29 U.S.C. § 107(c));

4) That the Hospital has no adequate remedy at law (29 U.S.C. § 107(d));

5) That the public officers charged with the duty to protect the Hospital's property are unable or unwilling to furnish adequate protection (29 U.S.C. § 107(e)); and

6) That the Hospital has made every reasonable effort to settle the dispute (29 U.S.C. § 108).

Because the Union challenges the district court's conclusions with regard to all of these elements, we will address each element in turn.

### 1. *Fraud and Unlawful Acts*

■ The Union disputes the district court's finding that the language contained on the banner is fraudulent and therefore constitutes an unlawful act. The Union argues that the term "rat" has deep historical meaning in the context of labor disputes and should not be subject to injunction. The Union contends that it was merely publicizing the facts of its labor dispute and its opinion that Best Interiors was a "rat contractor" for failing to pay its workers the prevailing wage. The district court concluded, however, that the *manner* in which the term "rat" was used on the banner was deceptive and misled "all persons exposed" to the banner "into believing that the banner is stating that plaintiff Hospital has a rodent problem."

■ The Union is correct that the NLA allows unions a great deal of latitude in their choice of language in the context of a labor dispute. The Supreme Court has noted that "labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 58, 86 S.Ct. 657, 661, 15 L.Ed.2d 582 (1966) (citation omitted). The Court has also noted that "federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 283, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974). The

license to use inflammatory rhetoric during a labor dispute, however, is not unbridled under the NLA. Where, as here, a union's fraudulent language is directed at a secondary entity with which it has no labor dispute at all, the speech cannot be protected as an exchange of "imprecatory language" between labor and management, and the NLA grants jurisdiction to a district court to issue an injunction prohibiting the unlawful activity.

The Union is also correct that the term "rat" has historical usage in the context of labor disputes, especially as those disputes involve the printing industry. Most dictionaries, in defining "rat," include an entry for an employer who fails to pay the prevailing wage. However, the district court did not prohibit the Union from using the term "rat," but, rather, enjoined the *manner* in which it was used in this case because, in context, the Union's use of the term was fraudulent.

The cases cited by the Union do not conflict with this conclusion. In *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union*, 840 F.Supp. 697 (E.D.Mo.1993), *aff'd*, 39 F.3d 191 (8th Cir. 1994), the district court ruled that a handbill distributed by the union that identified the grocery store with which the union had a labor dispute as a "rat" was protected by the federal labor laws because "this Court cannot construe the word to be a representation of fact. No one could read the handbill and believe that the owner/manager of Foodland was actually a rodent animal." *Id.* at 705. Because the handbill was not deceptive, the union's members were entitled to distribute it to the public.

In *BE&K Constr. Co. v. NLRB*, 23 F.3d 1459 (8th Cir.1994), *cert. denied*, 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995), the court noted that it was not improper for a trade union publication to urge "solidarity" against BE & K and describe the company as a " 'rat' contractor." *Id.* at 1463. In that context, the use of the term "rat" to describe

the management side of the labor dispute was likewise not deceptive or designed to mislead members of the general public. No reasonable reader would be misled by the use of the term "rat" in these circumstances.

■ The problem with the Union's use of the term "rats" in this case was not the mere use of the term, but the manner in which it was used. The district court found a high probability that members of the public would be and actually were deceived by the use of the term "rats" in the Union's banner. In the most prominent lettering, the banner reads: "THIS MEDICAL FACILITY IS FULL OF RATS." At no place in that phrase or in the entire banner does the Union identify Best Interiors as the "rat contractor." The term "rats" is used in the plural and is directed at the Hospital, not the contractor with whom the Union has the labor dispute. The allegedly explanatory language contained on the banner is in letters less than half the size of the first statement and is located at the bottom of the banner just above the feet of the individuals holding it. The words "Best Int." identifying the disputed contractor are smaller still, handwritten, and, as a result, difficult to read at best by drivers passing by on San Bernardino Road.[2] The cases cited by the Union to support the historical usage of the term "rat" to describe unfair employers do not undercut the district court's conclusion that the manner in which that term was used in the chosen context was deceptive and misled members of the general public into believing that the Hospital suffered from a sanitation problem.

■ We agree that "[e]xpressions of opinion, though inaccurate and even misrepresentative in character, obviously cannot be permitted to be made the basis ordinarily for injunctive process in a labor dispute." *International Ass'n of Bridge, Structural & Ornamental Iron Workers v. Pauly Jail*

---

**2.** The size of the lettering used by the Union is a factor in the determination of whether or not the Union's message was deceptive. In *NLRB v. San Francisco Typographical Union No. 21*, 465 F.2d 53 (9th Cir.1972), the union picketed a neutral party with the object of persuading consumers not to purchase a certain "struck product." The

NLRB determined that "the picket signs did not adequately identify the struck products, because such advertisements were too difficult for shoppers to read," and we held that "the union must accept the burden of properly identifying the [target of the strike]." *Id.* at 56.

*Bldg. Co.,* 118 F.2d 615, 616 (8th Cir.), *cert. denied,* 314 U.S. 639, 62 S.Ct. 75, 86 L.Ed. 513 (1941). We also agree that "[a]ccusations of unfairness against an employer normally will fall within this category" of opinion. *Id.* In this case, however, the phrase "THIS MEDICAL FACILITY IS FULL OF RATS" cannot be construed as an opinion. It certainly is designed to grab the reader's attention, but only because it purports to be an expression of fact [3] which, if true, would deter reasonable people from seeking medical care at the Hospital. As an expression of fact, it falls within the congressional purpose behind the NLA

> to leave the federal courts free to enjoin those permeative acts, falling within the term "fraud or violence," which an unsluggish public conscience and a healthy social order cannot soundly tolerate, even at the risk of thereby enabling one of the parties to tip the scales of the fundamental dispute.

*Id.* at 617.[4]

 This case is similar to *Mercy Health Servs. v. 1199 Health and Human Serv. Employees Union,* 888 F.Supp. 828 (W.D.Mich. 1995), where the court concluded that certain television commercials were "defamatory because they attempt to frighten Michigan residents into believing that Mercy Health Services' hospitals in Michigan cannot deliver adequate care and comfort because they are not adequately staffed with trained, experienced nurses available to answer patients' calls." *Id.* at 835. The Union in this case concedes that it does not now and never has believed that the Hospital suffers from rodent infestation. The Union's banner,

though, can be read as an attempt to frighten potential patients into believing that the Hospital is an unsanitary facility. The district court could properly conclude on this record that the Union's banner was fraudulent because, as the California Supreme Court has held, "[t]here can be no doubt that untruthful picketing is unlawful picketing." *Magill Bros., Inc. v. Building Serv. Employees' Int'l Union,* 20 Cal.2d 506, 508, 127 P.2d 542 (Cal.1942). The NLA does not protect the Union's fraudulent speech here.[5]

### 2. *Irreparable Injury and No Adequate Legal Remedy*

 The district court heard evidence from several of the Hospital's employees that they spent a portion of their time explaining to patients and other employees that the Hospital was not actually infested with rodents. Though there is no indication that patients and Hospital employees remained confused and misled after they were told that the Hospital was not actually suffering from sanitation problems, the time spent by Hospital employees explaining the nature of the labor dispute and reassuring patients was time taken away from their ordinary administrative and medical care duties.

The Hospital also introduced evidence that its reputation and, consequently, its fundraising ability had been impaired since the Union began displaying the fraudulent banner. Potential contributors were less likely to donate funds to the Hospital if they believed the facility was actually infested with vermin and maintained unsanitary conditions. As another court recently noted: "The reputation of a hospital is difficult to restore once

**3.** It is true that the Supreme Court has held that "[i]n the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940). This only permits, however, the dissemination of *truthful* facts concerning the labor dispute, not fraudulent representations unrelated to the actual dispute.

**4.** The danger of tipping the scales in favor of the employer by issuing the injunction in this case is absent because the labor dispute is not between

the Union and the Hospital. The Hospital gains no competitive advantage in this labor dispute by the issuance of the injunction precisely because the Hospital is not involved in the labor dispute.

**5.** The Supreme Court's opinions in *Linn* and *Letter Carriers,* relied on by the dissent to support the application of the actual malice standard to the Union's conduct (see dissenting op., at 694 n. 4), are inapposite to the fraud requirement of the Norris–LaGuardia Act. Those cases dealt with defamation actions and the National Labor Relations Act. We express no opinion as to whether the Hospital presented sufficient evidence to support a defamation action against the Union.

it has been tainted." *Mercy Health Servs.*, 888 F.Supp. at 838. We agree.

Finally, it is impossible to measure the number of potential patients who were deterred from seeking medical care at the Hospital due to their misunderstanding of the Union's banner because they are not available to be counted. Because the banner was located directly in front of the entrance to the Hospital's maternity ward, however, evidence from employees who worked in that area provided one reasonable measurement of the deterrence caused by the Union's conduct, demonstrating a statistically significant drop in maternity patients. Cathy Knittle, an Assistant Director of Business Services at the Hospital and the person in charge of the department responsible for admissions to the Hospital, testified that maternity preadmissions, a method of early registration for expectant mothers, had dropped by 200 patients per month since the Union began displaying the banner. This drop in maternity preadmissions is not insignificant.[6] The district court reasonably concluded that the Hospital suffered irreparable injury as a result of the Union's fraudulent activity and had no adequate legal remedy to redress the harm caused.

### 3. *Balancing the Hardships*

■ The Hospital provided substantial evidence regarding the injury it sustained as a result of the Union's fraudulent conduct. The burden to the Union of clarifying its banner, however, is slight in light of the narrowness of the district court's injunction. Shortly after the district court issued its injunction in this case, the Union began displaying a second banner with twelve-inch red capital lettering alongside the first banner which reads: "BEST INTERIORS IS THE RAT CONTRACTOR." The Hospital filed an *ex parte* application to the district court, asking for a contempt citation, but the district court ruled that the injunction had not been violated because the Union had clarified the misleading nature of the term "rats." Due to the narrow scope of the district court's injunction and the ease with which the Union complied with its requirements, the Union has been burdened only slightly at best as a result of the issuance of the injunction.

### 4. *Local Police*

■ The Hospital introduced evidence that administrators at the Hospital had contacted the local police department and were told that the police were unable to do anything about the banner. The Union contends that this testimony was hearsay and therefore inadmissible. The district court did not sustain the Union's objection, however, which was not raised until the end of the witness's direct examination. Therefore, the evidence was properly admitted and the untimely objection was waived.[7]

### 5. *Efforts to Settle the Dispute*

■ The Union argues in a footnote near the end of its opening brief that the Hospital introduced insufficient evidence "to establish that it engaged in all reasonable efforts to settle the matter before seeking injunctive relief." At the evidentiary hearing, however, the Hospital introduced evidence that it had engaged the Union on a number of occasions in an effort to resolve this dispute before seeking an injunction. There is sufficient

---

**6.** The dissent faults our reliance on Ms. Knittle's testimony, calling it "not sufficient" evidence of substantial and irreparable injury. See dissenting op., at 694. Had this been the only evidence of injury the Hospital presented to the district court, we might agree. However, the dissent overlooks the additional evidence presented by several Hospital employees regarding lost administrative time and damage to the Hospital's reputation and fund-raising ability. Taken together, this is sufficient evidence of substantial and irreparable injury. We will not second-guess the district court's credibility judgments or the plausibility of believing the deterrent force of the banner's display. These factual determinations are not clearly erroneous and are best left to the district court judge, who conducted a careful review of the evidence and had the opportunity to evaluate the credibility of the witnesses.

**7.** The Union also argues, for the first time on appeal, that the Hospital did not give the police department advance notice of the preliminary injunction hearing, as it is required to do by 29 U.S.C. § 107(e). This is incorrect. The Hospital serviced notice of the hearing to Chief Martin Thouvenell via Federal Express at least seven days before the hearing.

evidence in the record to support the district court's conclusion that the Hospital satisfied this element.

■ We emphasize the narrowness of our decision. The Union displayed a banner in front of the Hospital, a secondary entity that was not a party to the labor dispute with Best Interiors, that included a prominent declaratory statement of fact which the Union knew to be false. The Norris–LaGuardia Act generally prohibits federal courts from issuing injunctions in labor disputes, but when a union commits fraud against a neutral secondary entity, the Act grants jurisdiction to federal courts to enjoin the fraudulent activity. The district court in this case carefully crafted a narrow injunction that prohibited the fraudulent manner in which the Union used the term "rats," but did not prohibit the use of the term itself. The Hospital presented sufficient evidence to the district court from which it could draw the reasonable conclusion that the strict requirements of the NLA were satisfied. As a result, the district court did not abuse its discretion in issuing a narrowly tailored preliminary injunction to prevent the Union from using the term "rats" in a fraudulent manner.

### B. *Prior Restraint*

■ The Union argues that the district court's preliminary injunction amounts to an unconstitutional prior restraint on speech. This issue, however, is rendered moot by our resolution of the district court's jurisdiction under the NLA. We concluded above that the district court correctly found that the Union's display of the banner was fraudulent. The First Amendment does not protect fraud. *See Gehl Group v. Koby,* 63 F.3d 1528, 1534 (10th Cir.1995). As the California Supreme Court has noted: "The policy of this state which characterizes the use of false or fraudulent statements in picketing as

unlawful is within the permissible limits which a state may impose upon industrial combatants without impairing the right of free speech." *Magill Bros.,* 20 Cal.2d at 512, 127 P.2d 542 (citing *Thornhill,* 310 U.S. at 104, 60 S.Ct. at 745). We agree.[8]

## III. CONCLUSION

After considering the entire evidentiary record and all of the Union's arguments on appeal, we conclude that the district court did not abuse its discretion in issuing its narrowly tailored preliminary injunction prohibiting the Union's fraudulent activity because the Hospital satisfied the strict requirements of the Norris–LaGuardia Act. We therefore AFFIRM.

AFFIRMED.

KOZINSKI, Circuit Judge, dissenting.

Those who would enjoin speech concerning a matter of public interest must bear a heavy burden, *see Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971) ("heavy presumption" of unconstitutionality), more so if the speech in question concerns a labor dispute. *See* Norris–LaGuardia Act, 29 U.S.C. § 104(e) (prohibiting injunctions of labor speech unless "involving fraud or violence"); *Marine Cooks & Stewards v. Panama S.S. Co.,* 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960) ("[The NLA's] language is broad because Congress was intent upon taking the federal courts out of the labor injunction business....").[1] The Hospital here did not carry its burden of showing it will suffer a "substantial and irreparable injury." *See* 29 U.S.C. § 107(b). It's implausible to believe that anyone choosing what hospital to patronize, or whether to donate money, would make such a weighty decision on the basis of a fleeting glance at a picket

**8.** The Union also asks this court to "simply order San Antonio's common law causes of action dismissed" because, the Union argues, they are preempted by the National Labor Relations Act. This question is beyond the scope of the appeal. We therefore decline to address it.

**1.** The banner here was used in prosecuting a labor dispute, and "rats" is a term of art which conveys a specific, nondefamatory meaning in that context. *See* maj. op. at 691. In addition to rodents and police informants, the term refers both to contractors who pay less than the prevailing wage and to workers who accept such a wage. *See 2 The Compact Edition of the Oxford English Dictionary* 2418 (1st ed., 24 prtg. 1985); *Webster's Third New International Dictionary* 1884 (1981).

sign during a drive-by. People ain't that dumb; they would investigate and discover the truth.[2] There is no proof of a single person who was deterred by the sign from using the hospital or donating money-not a one. The evidence about the decline in maternity ward admissions is not sufficient, as there was no connection-temporal or otherwise-to the union's picketing; the decline started in April, but the sign didn't go up until late June.[3] Either there were a lot of clairvoyant (but gullible) expectant mothers in Upland, California, or the decline had nothing to do with the union's banner.

This may not seem like a big deal. Who, after all, can object to forcing the union to change its banner so as to avoid even a small risk of deceiving the public? But ambiguity and flamboyance are often at the heart of political expression. Who, for example, can forget "Where's the Beef" from the 1984 Presidential campaign? But what if Senator Mondale been forced to say: "Where's the substance?" No one would have noticed or remembered.

So too with rats. Changing the sign may make it clearer, may avoid the smallest risk

of confusion, but it saps the message of its vigor. *See Old Dominion Branch No. 496, Nat'l Assn. of Letter Carriers v. Austin,* 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974) (use of the word "traitor" in a definition of a union "scab" not the basis for a defamation action since used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members"). I don't believe courts are equipped-or even permitted-to evaluate such trade-offs.[4] Because the sign here was literally true, within an accepted meaning of the word used, I would quash the injunction and let the parties work out their differences in the marketplace-and in the marketplace of ideas.

---

**2.** The truth here would have been easy to find as the union was passing out flyers explaining that "[a] rat is a contractor that does not pay all of its employees prevailing wages or provide health and pension benefits to all of its employees." As well, prospective patients or donors could have asked-and in fact did ask-hospital personnel for clarification.

**3.** The decline was calculated based on a comparison between 1600 admissions in March 1996 and 1400 at the time of evidentiary hearing on August 9, 1996. The banner first went up on June 21, 1996-almost three months after the benchmark date.

The *entire* record on the decline is the following testimony by the Hospital's Assistant Director of Business Services:

DIRECT EXAMINATION

Q. Since the banner has been up, have you noticed a decline of the number of preadmits to the Maternity Department?

A. Yes.

. . . .

I received daily reports, and we are approximately 200 maternity patients.

Q. Downwards?

A. Yes.

CROSS–EXAMINATION

Q. And you say that statistically your report shows that the number of maternity patients

has declined 200 over what, the month before or what, over what standard?

A. Statistically up until about March we had 1600 preadmits per month. We are down to 1400.

E.R. tab 11, at 77–79.

**4.** In fact, the majority ignores Supreme Court caselaw to the extent it enjoins labor speech merely because it's deceptive, misleading or even untruthful. *See* maj. op. at 651. Under the NLA, an injunction can only issue upon a showing that "unlawful acts have been threatened," 29 U.S.C. § 107(a); when speech is involved, an additional showing of "fraud or violence" is required. *Id.* § 104(e). As there was no threat of violence, the only remaining issue is whether the sign amounted to fraud. Fraud in this context does not mean common-law fraud, but fraud that satisfies the *New York Times* actual malice standard. *See Linn v. United Plant Guard Workers,* 383 U.S. 53, 61, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966) (NLRA preempts state libel law to the extent it provides liability without a showing of actual malice); *Letter Carriers,* 418 U.S. at 278–79, 94 S.Ct. at 2778–79 (same for Executive Order No. 11491, the precursor to the Federal Service Labor–Management Relations Statute, 5 U.S.C. § 7101 *et seq.*). No one, least of all the majority, contends the sign here satisfies *New York Times.*